[No. G033363. Fourth Dist., Div. Three. Nov. 23, 2004.]

SUPERBRACE, INC., et al., Plaintiffs and Respondents, v.
KELLY TIDWELL et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Parts III, IV, V and VI of this opinion are not certified for publication. (See Cal. Rules of
Court, rules 976(b) and 976.1.)

 

COUNSEL

McClaugherty & Associates, Jay S. McClaugherty and David H. Ryan for Defendants and Appellants.

The Walker Law Firm, Joseph A. Walker and Mary G. Finlay for Plaintiffs and Respondents.

OPINION

**O'LEARY, Acting P. J.**—There is a debate among federal and state courts as to whether state or federal common law should be applied to cases involving the transfer of patent license rights. In the case before us, Kelly Tidwell and Fran Cyrus (collectively Tidwell unless otherwise indicated) challenge the trial court's application of state law in holding Robert and Barbara Gebauer could transfer their exclusive license to manufacture, market, and sell Tidwell's patented inventions. After considering our Supreme Court's ruling in *Farmland Irrigation Co. v. Dopplmaier* (1957) 48 Cal.2d 208 [308 P.2d 732] (*Dopplmaier*), and reviewing recent federal cases to the contrary, we affirm the trial court's ruling. Applying state law, we conclude the license rights were not personal and therefore were assignable. Tidwell also challenges the court's (1) order obligating Tidwell to protect the patents until the Gebauers obtain the patent titles; (2) order allowing the Gebauers to retain and sell (if they desire) their motor oil distribution rights; and (3) refusal to impose damages for patent infringement. On a finding Tidwell's contentions lack merit, we affirm judgment.

I

Tidwell owns and operates several companies. S.T.D. Enterprises, Inc., manufactures specially formulated motor oils and lubricants. PurePower Lubricants, Inc., distributes S.T.D.'s products. In addition, Tidwell has invented several products tailored for the motorcycle industry, including: (1) a fork stabilizer that attaches to the front of a motorcycle to aid with steering; (2) a belly pan to be placed underneath certain motorcycles to create an added down force; and (3) a trailer hitch for motorcycles. Tidwell patented these products and obtained the trade name "SuperBrace" for use in conjunction with the development, manufacturing, and marketing of these inventions to the motorcycle community.

Tidwell was friends for many years with his next-door neighbors, Robert and Barbara Gebauer. After much discussion, the Gebauers decided to

purchase part of Tidwell's business. Because the agreement was between friends, the parties did not consult an attorney and instead Robert Gebauer drafted the contract.

The agreement consists of 10 plainly worded paragraphs. The first three described what was being sold: (1) all assets currently owned by Tidwell under the name of "SuperBrace"; (2) the SuperBrace and Belly Pan patents and trademarks; (3) the exclusive "world sales rights" to the motorcycle industry of the "SuperBrace front fork brace, [the] System 1 stainless steel oil filter, a SuperBrace line of S.T.D. Enterprises oil, [the] Belly Pan and the trailer hitch"; and (4) all inventory generally used or related to the motorcycle business, including work tables, and the present 800 phone number.

Tidwell agreed "to protect" the Gebauers' "exclusive world sales rights, without time limits, on all the products mentioned . . . in any sale or other actions taken with either" PurePower or S.T.D. Tidwell promised to give the Gebauers six weeks of training as well as eight months of "promotional and technical advice." In return, the Gebauers agreed to use a certain grade aluminum when manufacturing the inventions and to "continue to maintain the quality of the products in every way possible."

Two paragraphs were devoted to the terms of the sale. The sale price was set at $325,000. The Gebauers agreed to provide a $108,000 down payment and pay the balance in 120 monthly installments in addition to a 4 percent rate of interest. The contract provided the loan would "be secured by the retention of the SuperBrace patents and the assets of the new SuperBrace Inc. corporation."

The following year, the Gebauers asked Scott Edwards (owner of American Metal Engineering, LLC) to fabricate the SuperBrace fork stabilizers. Approximately three years later, the Gebauers advised Tidwell they wanted to sell "the business" to Edwards. Tidwell asserted the business could not be transferred until the full balance owed on the contract had been paid.

SuperBrace, Inc., the Gebauers, American Metal Engineering and Edwards (collectively Gebauers unless otherwise indicated) filed a complaint seeking: (1) declaratory relief on the right to sell the business to Edwards; (2) damages for breach of contract based on allegations Tidwell sold motor oil to the motorcycle industry; and (3) an injunction prohibiting Tidwell from selling any more motor oil to the motorcycle industry.

Tidwell filed a cross-complaint alleging breach of contract based on the Gebauers' alleged failure to make payments on the debt and failure to successfully sell S.T.D.'s oil and products to the motorcycle industry. Tidwell

asserted the Gebauers could not transfer their license to Edwards, and sought an injunction to stop Edwards from "practicing the patents." Tidwell also sought declaratory relief on the issue of whether the Gebauers had abandoned the motorcycle oil distributorship and requested the reversion of all selling rights back to Tidwell. In addition, Tidwell sought termination of the agreement and an injunction precluding the Gebauers from manufacturing, marketing, or selling the patented motorcycle products.

The Gebauers prevailed after a court trial. In a lengthy judgment and statement of decision, the court determined the Gebauers could assign their rights to Edwards and enjoined Tidwell from selling motor oil to the motorcycle industry. However, the court also decided the sale could only occur between the Gebauers and Edwards, and that Edwards could not resell the rights until the debt was paid and the SuperBrace patents and assets no longer served as security.

## II

### SHOULD STATE LAW OR FEDERAL COMMON LAW APPLY IN THIS CASE?

The United States patent statutes grant a patent owner the exclusive right to make, use, sell, and offer for sale the patented invention or discovery for a limited period of time. (35 U.S.C. § 271(a).) A patent has the "attributes of personal property." (35 U.S.C. § 261.) Therefore, its ownership may be transferred by an assignment. An assignee may freely transfer his or her acquired rights. (*Ibid.*)

A patent owner may also grant rights to a license to practice the invention in exchange for consideration (commonly referred to as royalties). "A license differs most fundamentally from an assignment in the respect that a licensor retains legal title to the patent whereas an assignor transfers his title to the patent." (2 Browne, Cal. Business Litigation (Cont.Ed.Bar 2002) § 8.103, p. 788 (rev. 12/03).) Another important difference is that while the patent statutes unequivocally deal with assignments, there are no provisions governing licenses.

Federal courts have fashioned a rule of federal common law to apply in cases concerning transfers of patent licenses. It is now well settled that a licensee has only a personal and not a property interest in the patent, which is not transferable unless the patent owner authorizes the assignment or the license itself permits assignment. (See *Everex Sys. v. Cadtrak Corp. (In re CFLC, Inc.)* (9th Cir. 1996) 89 F.3d 673, 679 (*Everex*) [regarding nonexclusive licenses]; *In re Hernandez* (Bankr. D.Ariz. 2002) 285 B.R. 435 [applying same logic to exclusive licenses].)

However, in California, the Supreme Court determined *state law*, not federal common law, should be applied when deciding whether a patent license is assignable. (*Dopplmaier, supra*, 48 Cal.2d 208.) In that case, an inventor granted a nonexclusive license to a manufacturer to produce his patented "agricultural sprinkling apparatus." (*Id.* at p. 213.) The agreement permitted the manufacturer to sublicense its rights "on condition that it assume responsibility for the payment of all royalties due on sales by its sublicensees." (*Id.* at p. 214.) Within a few years the licensee's corporation dissolved and its assets passed to its shareholders, who in turn sold the assets (including the license agreement) to Farmland Irrigation Company. At first, the inventor accepted royalty payments from Farmland, but then changed his mind and filed a lawsuit in district court seeking an accounting of royalties allegedly owed. Farmland "counterclaimed for a declaration of its rights under the license." (*Ibid.*) It also filed an action in California, where the state court determined the licensee's rights were assignable. The inventor appealed.

Justice Traynor, writing for the unanimous California Supreme Court, affirmed the judgment. The court first noted that the United States Supreme Court has often applied state law to many patent license disputes. It stated, "Every action that involves, no matter how incidentally, a United States patent is not for that reason governed exclusively by federal law. The police power of the states, for example, has long been held to include reasonable regulation of the manufacture and sale of patented articles dangerous to public safety [citation], and regulation of the transfer of patent rights to prevent fraud. [Citation.] A patent is not granted without reference to the general powers the states possess over their domestic affairs." (*Dopplmaier, supra*, 48 Cal.2d at pp. 216–217.)

The Supreme Court explained, "It has been established by a long line of cases, . . . that an action to set aside, specifically enforce, or recover royalties on a patent license contract is not an action arising under the patent laws of the United States for the purpose of determining the exclusive jurisdiction of the federal courts. [Citations.] State courts have jurisdiction over such actions, and in the absence of diversity of citizenship it is exclusive of the federal courts. [Citations.] [¶] These authorities were concerned with whether a case was one 'arising under the patent laws' within the meaning of the federal jurisdictional statutes and the federal policy apportioning business between state and federal courts. Nevertheless, since the jurisdictional test they established was tied to the law that created the cause of action stated in the complaint and made the source of that law its operative fact [citations], in holding that federal jurisdiction did not exist, they necessarily held that the patent statutes did not govern the elements of the plaintiff's case." (*Dopplmaier, supra*, 48 Cal.2d at p. 217.)

The *Dopplmaier* court highlighted the United States Supreme Court case *Wilson v. Sandford* (1850) 51 U.S. (10 How.) 99, 101–102 [13 L.Ed. 344], which held that a dispute arises out of a contract if it " 'does not arise under any act of Congress' " or " 'depend upon the construction of any law in relation to patents' " and " 'there is no act of Congress providing for or regulating contracts of this kind.' " (*Dopplmaier, supra,* 48 Cal.2d at p. 218.) It also referred to cases holding that "absent a question of the validity or scope of the patent itself, there was no jurisdiction in the United States Supreme Court to review state court decisions on patent licenses. [Citations.]" (*Ibid.*)

In light of the above authority, the *Dopplmaier* court concluded Farmland's cause of action "arose under and was governed by the general common law of contracts." (*Dopplmaier, supra,* 48 Cal.2d at p. 218.) It explained, "Licenses have no statutory basis, and rights under them arise from contract rather than from the fact that patent rights are involved. [Citation.]" (*Id.* at p. 220.) Finally, citing the holding of *Erie R. R. Co. v. Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817] (*Erie*), the court held "the law governing the elements of [Farmland's] cause of action is state law—state law acting of its own force and not merely by incorporation into federal law. The language of Mr. Justice Holmes in *American Well Works Co. v. Layne & Bowler Co.* [1916], 241 U.S. 257, 260 [60 L.Ed. 987, 36 S.Ct. 585] a case involving an action for libel and slander of the plaintiff's title to a machine the defendant claimed infringed his patent, is appropriate: 'But whether it is a wrong or not depends upon the law of the State where the act is done, not upon the patent law, and therefore the suit arises under the law of the State. A suit arises under the law that creates the cause of action. . . . The State is master of the whole matter, and if it saw fit to do away with actions of this type altogether, no one, we imagine, would suppose that they still could be maintained under the patent laws of the United States.' [Citations.]" (*Dopplmaier, supra,* 48 Cal.2d at pp. 218–219.)[1]

The Supreme Court recognized this conclusion did not "completely dispose of the problem." (*Dopplmaier, supra,* 48 Cal.2d at p. 219.) It observed, "Even if state law governs the basic elements of the plaintiff's case in an action to recover royalties on a license, it does not follow that every issue in the case, including the assignability of the license, is governed by state law. [Citations.] If the policy of the patent laws or some other federal statute requires it, state law must of course give way. [Citations.] Moreover, the absence of any specific statutory provision governing the issue does not in itself mean that federal law does not control, for if the policy of the federal statute or the

---

[1] In *Erie,* the United States Supreme Court declared that "[t]here is no federal general common law." (*Erie, supra,* 304 U.S. at p. 78.) This is commonly referred to as the Erie Doctrine.

implications of the federal system require a uniform rule of decision, the federal courts have paramount power to fashion such a rule. [Citations.]" (*Dopplmaier, supra,* 48 Cal.2d at p. 219.)

After much consideration, the court in *Dopplmaier* concluded there was "no policy underlying the federal patent statues that requires a uniform federal rule of construction of license contracts to determine their assignability. The purpose in granting a patent monopoly is to promote progress in science and the useful arts by stimulating invention and encouraging disclosure. So long as state law does not destroy the advantages of the monopoly, it respects the federal purpose, and there is no reason why it should not govern, as with any other property, the incidents attached to the ownership of the patent." (*Dopplmaier, supra,* 48 Cal.2d at p. 220.) The court acknowledged Congress may "legislate on this subject and thereby oust state law [citation], but in the absence of such action we will not postulate a policy we cannot find in the existing federal statutes. If any federal interest exists, it is too remote and speculative to justify displacing state law. [Citation.]" (*Ibid.*)

As for the existing line of federal cases holding to the contrary, the *Dopplmaier* court held those cases failed to create a general federal policy against the free assignability of licenses. It noted many of the cases were written before *Erie*, "and therefore involved no conscious choice between state and federal law." (*Dopplmaier, supra,* 48 Cal.2d at p. 219.) The court found that the few federal cases written after *Erie* "do not state what law governs the issue [citations], and decisions from the state courts have been equally unenlightening on the applicable law." (*Ibid.*)

■ Having determined "the question is one for determination by the law of this state," the Supreme Court continued on to define the applicable state law. (*Dopplmaier, supra,* 48 Cal.2d at p. 221.) It concluded, "The statutes in this state clearly manifest a policy in favor of the free transferability of all types of property, including rights under contracts. (Civ. Code, §§ 954, 1044, 1458.) The terms and purpose of a contract may show however, that it was intended to be nonassignable. Thus the duties imposed upon one party may be of such a personal nature that their performance by someone else would in effect deprive the other party of that for which he bargained. The duties in such a situation cannot be delegated. [Citation.] Rights likewise cannot be assigned if the assignment would materially impair the nonassigning party's chance of obtaining the performance he expected. [Citations.]" (*Id.* at p. 222.)

The court acknowledged federal cases are generally viewed as persuasive authority, but concluded that on this issue the federal authority was unconvincing. It explained, "The authoritative federal statement that a patent license is not assignable unless made expressly so is contained in *Hapgood* v. *Hewitt* [1886] 119 U.S. 226, 233–234 [30 L.Ed. 369, 7 S.Ct. 193] [(*Hapgood*)] . . . . The court stated that the license was purely personal and was extinguished with the dissolution of the corporate licensee, although it pointed to no peculiarly personal rights involved. The court relied on the earlier cases of *Troy Iron & Nail Factory* v. *Corning* [1852] 14 How. ([55] U.S.) 193, 216 [14 L.Ed. 383] [(*Troy*)], and *Oliver F. & C. Co.* v. *Rumford Chemical Works* [1883] 109 U.S. 75, 82 [27 L.Ed. 862, 3 S.Ct. 61] [(*Oliver*)]. The statement in the Troy case, however, was not necessary to the decision, and in *Oliver* . . . there were provisions in the license calling for the exercise of the personal skill of the licensee that would have restricted transfer of rights under the license even under ordinary rules of construction. In *Providence Rubber Co.* v. *Goodyear* [1869] 9 Wall. ([76] U.S.) 788, 799 [19 L.Ed. 566], another case before *Hapgood* v. *Hewitt*, the court found the licensee's rights personal and nonassignable only after examining the terms of the instrument and the testimony in the record to ascertain the true meaning and purpose of the contract. [Citation]. [¶] Many of the cases since *Hapgood* v. *Hewitt* can be explained on the ground that language in the instrument or the purposes of the contract clearly excluded assignability [citations], but nevertheless the rule of *Hapgood* v. *Hewitt* appears to have been consistently adhered to by the federal courts, although without any satisfactory explanation of the reasons underlying it. [Citations.] The only exception is when the transferee succeeds to the entire business of the licensee, and assumes all its assets and liabilities. [Citation.] [¶] We are not persuaded that the United States Supreme Court would, in view of the modern tendency in favor of assignability, adhere today to the rule it laid down in *Hapgood* v. *Hewitt*. Furthermore, we do not find it necessary or wise to establish a fixed rule, peculiar to patent licenses, that such contracts are not assignable unless made expressly so. There is no reason to exempt these contracts from a general rule adapted to facilitate the freest possible transfer of valuable contract rights, while at the same time respecting the parties' intentions. The federal cases have relied on the flat statement that a license creates a merely personal right. This statement should follow as a conclusion from an examination of the purposes and provisions of the particular license, rather than stand as a self-evident first principle. Nothing in the nature of patent licenses makes the rights conferred by them necessarily so personal that the parties must have intended that they be nonassignable." (*Dopplmaier, supra,* 48 Cal.2d at pp. 221–222.)

Recognizing the trial court, and this court, are legally bound to follow Supreme Court precedent, Tidwell nevertheless urges us to hold the Supreme

Court was wrong 50 years ago. It argues that "although the United States Supreme Court has not revisited *Hapgood*, recent federal decisions show that [*Dopplmaier*] is incorrect in its assumption that *Hapgood* was not correctly decided." (Citing *Everex, supra,* 89 F.3d 673.) Stated another way, Tidwell believes recent federal cases have effectively created a general federal policy against the free assignability of licenses that state courts can no longer ignore. We are not persuaded.

Tidwell maintains a 1996 Ninth Circuit federal case (*Everex*) provides a satisfactory federal policy explanation to support the 1886 *Hapgood* rule. In *Everex*, the Ninth Circuit analyzed the preemption issue. It offered the following rationale: "The construction of a patent license is generally a matter of state contract law, [citation], except where state law 'would be inconsistent with the aims of federal patent policy, [citations]. Two circuits have found such an inconsistency and expressly held that '[q]uestions with respect to the assignability of a patent license are controlled by federal law.' *PPG Industries, Inc. v. Guardian Industries Corp.* [(6th Cir. 1979)] 597 F.2d 1090, 1093 . . . ; *Unarco Industries, Inc. v. Kelley Co.* [(7th Cir. 1972)] 465 F.2d 1303, 1306 . . . ." (*Everex, supra,* 89 F.3d at pp. 677–678.)

The Ninth Circuit dissected in depth the *Unarco* opinion, finding the Seventh Circuit's reasoning "less firm than might be wished." Nevertheless, the Ninth Circuit reached the same ultimate conclusion (but for different reasons). It determined, "Federal patent policy . . . does justify the application of federal law here. The fundamental policy of the patent system is to 'encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design' by granting the inventor the reward of 'the exclusive right to practice the invention for a period of years.' [Citation.] Allowing free assignability—or, more accurately, allowing states to allow free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder *or* seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents. And while the patent holder could presumably control the absolute *number* of licenses in existence under a free-assignability regime, it would lose the very important ability to control the *identity* of its licensees. Thus, any license a patent holder granted—even to the smallest firm in the product market most remote from its own—would be fraught with the danger that the licensee would assign it to the patent holder's most serious competitor, a party whom the patent holder itself might be absolutely unwilling to license. As a practical matter, free assignability of patent licenses might spell the end to paid-up licenses such as the one involved in this case. Few patent holders would be willing to grant a license in return for a one-time lump-sum payment, rather than for per-use royalties,

if the license could be assigned to a completely different company, which might make far greater use of the patented invention than could the original licensee. [¶] Thus, federal law governs the assignability of patent licenses because of the conflict between federal patent policy and state laws, such as California's, that would allow assignability." (*Everex, supra,* 89 F.3d at p. 679.)

We question whether the *Everex* court's explanation is satisfactory. The *Everex* opinion prompted several scholars to examine the preemption holding. (Wilson, *Patent License Assignment: Preemption, Gap Filling, and Default Rules* (1997) 77 B.U. L.Rev. 895; Quinn & Weide, *Violation of the Erie Doctrine: Application of a Rule of Federal Common Law to Issues of Patent License Transferability* (1999) 32 Creighton L.Rev. 1121; Fellmeth, *Control Without Interest: State Law of Assignment, Federal Preemption, and the Intellectual Property License* (2001) 6 Va. J. L. & Tech. 8.) These authors all found fault with the Ninth Circuit's analysis. We found their well-reasoned conclusions regarding the *Everex* case and other federal cases applying the *Hapgood* rule to be instructive and persuasive.

As aptly stated by one author, "The Ninth Circuit's decision . . . is based upon a subtle misstatement of the issue before the court. That issue was not whether federal policy allowed a patent license to be freely assignable, but whether federal policy forbade the application of state law to a matter of contract relating to the transfer of a federal right. With the issue reframed in this manner, it is difficult to fathom why the Ninth Circuit felt free to ignore the silence of the Patent Act on this issue and preempt the normally applicable state contract law. The court, though able to cite ample precedent (not all of it strictly germane), appears oblivious to the licensor's ability to impose a contractual limitation on assignment, which renders a judicially created right against assignment superfluous. Moreover, in its solicitude for the licensor, the Ninth Circuit never seemed to consider the other side of its dire prediction. What if a nonexclusive licensee pays a lump sum and then finds his business paralyzed, or is an individual who dies two weeks after the license begins to run? In the absence of a contractual provision allowing assignment, the licensee's royalty and the benefit of the bargain are equally lost. Yet, this drastic possibility does not seem to have uniformly deterred licensees from accepting nonassignable, nonexclusive licenses." (Fellmeth, *Control Without Interest: State Law of Assignment, Federal Preemption, and the Intellectual Property License, supra,* 6 Va. J. L. & Tech. at pp. 74–75, fns. omitted.)

In the Fellmeth law review article, the author carefully reviewed all facets of the federal preemption issue (including *Dopplmaier* and the contrary federal cases) and concluded, "Given the inherent protections to the copyright

or patent licensor under state law, federal courts appear to have overreached themselves in continuing to invent federal common law to forbid the assignment of a license agreement. The protections granted by state law to the licensor are largely the same regardless of whether the license is exclusive or nonexclusive. . . . [¶] [T]he current chain of logic supporting a 'federal public policy' contrary to the free assignability of licenses is broken at every link. The [federal] cases [applying the rule] first assume without support or thorough analysis that the free assignability of license agreements is inherently harmful to licensors and has no offsetting benefits. They then assume that the application of state common law would result in such harmful free assignability. They further assume that there is a federal public policy, under the Patent Act and the Copyright Act, that forbids the application of any state law that might in some circumstances be harmful to the patentee or copyright owner. Finally, they assume that such federal public policy mandates the creation of a uniform federal rule against assignability to protect the patentee or copyright owner against such harm. [¶] As discussed above, each of these assumptions is incorrect. . . . In the case of the assignment of a patent or copyright license, state law in no way undermines the federal public policy of giving adequate reward to authors and inventors, regardless of whether such license is exclusive or nonexclusive. Courts that strike down harmless or beneficial state laws so indiscriminately violate the Rules of Decision Act and principles of federalism." (Fellmeth, *Control Without Interest: State Law of Assignment, Federal Preemption, and the Intellectual Property License, supra,* 6 Va. J. L. & Tech. at pp. 81–83, fns. omitted.)

Likewise, the authors of the Creighton Law Review article concluded "that those federal courts which have created and/or applied a 'federal rule' to resolve issues of a patent license transferability have violated the Erie doctrine." (Quinn & Weide, *Violation of the Erie Doctrine: Application of a Rule of Federal Common Law to Issues of Patent License Transferability, supra,* 32 Creighton L.Rev. at p. 1141, fns. omitted.) They specifically found fault in the *Everex* court's failure to "examine[] what outcome would result if the law of the forum state were applied. Application of state law might have resulted in an outcome identical to that arising from application of the federal rule. Consequently, if no conflict were to exist, state law should have been applied." (32 Creighton L.Rev. at p. 1143.) They explained, "Upon close scrutiny, it appears that the Ninth Circuit's justification for application of a federal rule is actually tailored to avoiding conflicts between the application of state law and federal bankruptcy law. If the Ninth Circuit had not decided the issue of patent license transferability as it did in *Everex*, the intent of the parties as expressed in the contract would likely have been thwarted and the license would have been assignable by the parties. This is because under section 365(c) of the Bankruptcy Code, the trustee is only prohibited from assuming or assigning the license if applicable law excuses performance,

whether or not the contract prohibits or restricts assignment. [11 U.S.C. § 365(c)(1)(A).] If the Ninth Circuit interpreted California law on the issue to be as in *Dopplmaier*, in which the court declared that a contract is freely assignable unless the contract provides otherwise, then the California law would not be of the type to invoke the exception of section 365(c) [of the Bankruptcy Code]. In that instance the license would be assumable and assignable by the trustee in bankruptcy. This would be contrary to the result if only California law were being applied, and contrary to the intent of the original parties to the license. The Ninth Circuit's choice of federal law avoids this potential 'unfairness.' As the Ninth Circuit also noted, the choice of federal law also avoided the need for the court to resolve an apparent conflict between other circuit courts regarding the interpretation of 'applicable law' under [the Bankruptcy Code] sections 365(f)(1) and 365(c)(1)(A)." (*Id.* at p. 1142.)

In addition, these authors noted, "An examination of the Patent Statutes does not evidence the [Ninth Circuit's] recited policy . . . . [F]ederal law grants a patentee the exclusive right to make, use, sell and offer for sale a patented invention. . . . Federal patent law does not ensure that a patentee receives adequate compensation, whether in the form of royalties or other compensation, any more than it protects the patentee from making a bad decision involving a transfer of the patentee's rights. In effect, the law is neutral, simply permitting the patentee to dispose of his or her rights as he or she desires. [¶] The fact that the particular rights at issue are government granted 'exclusive' rights does not support a finding that there must be a federal policy which serves to always protect the rights. In addition, and as noted by the court in *Dopplmaier*, while Congress was aware of the various decisions regarding patent license transferability when it enacted 35 U.S.C. section 261 in the 1952 Patent Act, it did not amend this section to clarify the rights of a licensee. In addition, since *Dopplmaier*, Congress has not revised section 261 or enacted a new statute to overrule *Dopplmaier*. This is true even though Congress amended section 261 in 1975 and 1982." (Quinn & Weide, *Violation of the Erie Doctrine: Application of a Rule of Federal Common Law to Issues of Patent License Transferability, supra*, 32 Creighton L.Rev. 1121, 1142–1143, fns. omitted.)

█ In light of the above well-reasoned and compelling analysis, we choose to stand steadfastly by our Supreme Court's 1957 ruling in *Dopplmaier* that state law, not federal common law, is to be applied when determining whether a patent license is assignable.

APPLICATION OF STATE LAW.

"California law evidences a policy in favor of the free transferability of all types of property. (Civ. Code, §§ 954, 1044, 1458.)" (*Robert H. Jacobs,*

*Inc. v. Westoaks Realtors, Inc.* (1984) 159 Cal.App.3d 637, 645 [205 Cal.Rptr. 620].) As articulated by the Supreme Court in *Dopplmaier,* "The terms and purpose of a contract may show however, that it was intended to be nonassignable. Thus the duties imposed upon one party may be of such a personal nature that their performance by someone else would in effect deprive the other party of that for which he bargained. The duties in such a situation cannot be delegated." (*Dopplmaier, supra,* 48 Cal.2d at p. 222.)

The trial court held the rights acquired by the Gebauers "are not personal and are assignable." Tidwell argues the court was mistaken. He explains there was "overwhelming" evidence showing the existence of a "personal relationship" between the contracting parties. He discusses evidence showing the parties were neighbors, friends, and shared a common concern about the financial future of the Gebauers' disabled daughter. He suggests, "Nothing demonstrates the personal nature of this agreement more than Mr. Gebauer's acknowledgement that Tidwell was willing to enter the agreement without a contract, stating that for Tidwell 'a handshake was going to be fine.' "

In addition, Tidwell highlights the following undisputed facts: (1) After the agreement was signed, the Gebauers continued to work out of Tidwell's shop and relied on Tidwell's business experience to run the SuperBrace business; (2) The agreement has several personal components such as Tidwell's agreement to train the Gebauers for up to six weeks and to attend two motorcycle rallies with the Gebauers; and (3) the Gebauers agreed to continue using the same grade aluminum for the invention. He concludes the above evidence proves the agreement "was intended to be personal."

Finally, Tidwell argues the sale of the patent rights over a 10-year period "evidences an intent for a personal contract. If [the] Gebauers were to default on the payments, the patent rights revert to [Tidwell]. Due to the personal friendship between [Tidwell and the] Gebauers, [Tidwell] would have an increased expectation that [the] Gebauers would properly protect the patent from infringement by others. However, if [the] Gebauers were permitted to assign," the new assignee would likely be "someone who was not friends with [Tidwell], and therefore less inclined to protect the patent from infringements. If that assignee were then to default and the rights to practice the patent reverted to" Tidwell, the patent rights might be substantially diluted by the infringement.

Certainly, there were personal aspects of the agreement because it was made between friends. Tidwell did not have to help the Gebauers get their business up and running, but he did. The Gebauers could have hired an attorney to draft the agreement before spending $325,000, but they did not.

However, these side arrangements have nothing to do with the nature of the actual licensing rights. Tidwell sold his patents to the Gebauers, retaining title to the patent as security for the unpaid debt. There was no personal aspect to this portion of the agreement. No one contends the patent was sold for less than its value. And, like any lender, Tidwell secured the debt and arranged to collect a reasonable rate of interest on the unpaid balance.

While payments were being made, Tidwell essentially granted the Gebauers an exclusive license to practice the patents. That the license is exclusive can be inferred from other terms in the contract. The parties contemplated a complete sale of the patents and necessarily understood that only the Gebauers (as the future owners) would have the right to practice the patent as they made payments. Implicit from the sale agreement is Tidwell's promise not to license the patents that have already been sold. Moreover, the contract specified that Tidwell would "protect" the buyer's "exclusive" world sales rights on "all the products."

██ However, there is no provision in the contract limiting the Gebauers' rights to sublicense or assign the property they purchased. After selling the patents, Tidwell's interests lay solely in receiving timely payments on the debt and keeping the debt secured (by title in the patent and in the assets of SuperBrace, Inc.). Neither of these obligations was personal. The Gebauers did not personally guarantee the loan.

Tidwell maintains that in addition to being paid he also had the expectation that his friends would feel more obligated than anyone else to take action against patent infringers. But this wishful thinking was not memorialized in the contract. Rather, there is language to the contrary. It states Tidwell "agree[s] to protect the Buyer's exclusive" interests. Placing this obligation on the patentee, as opposed to the licensee, is consistent with the general rules of patent law.

██ As aptly noted by the Gebauers, a licensee does not have standing to sue infringers, and over the years they needed Tidwell (the owner of the patent title) to file two lawsuits against infringers. "An exclusive licensee that does not have all substantial rights to a patent has standing to sue third parties for patent infringement only as a co-plaintiff with the patentee." (2 Browne, Cal. Business Litigation, *supra*, § 8.103, p. 788 (rev. 12/03), citing *Mentor H/S, Inc. v. Medical Device Alliance, Inc.* (Fed. Cir. 2001) 244 F.3d 1365.) In light of these well-established rules, it would have been unreasonable for Tidwell to assume the Gebauers, as licensees, were personally responsible for filing actions against infringers. Tidwell had the duty and obligation to protect the patents (and keep the loan secure) while he still held title to the patents.

 We have reviewed cases prohibiting assignment of a contract right and found there always exists evidence that a personal skill, promise, or performance was expected by one of the contracting parties. As one court succinctly summarized long ago, "There are contracts for personal service or other personal performance which cannot be assigned so as to transfer the concurrent obligation without the consent of the person entitled to such performance. This is illustrated by the contract of an artist to paint a portrait; or a sale of land under agreement by the purchaser to execute his own promissory note for a part of the purchase price. [Citations.]" (*Gribling v. Bohan* (1915) 26 Cal.App. 771, 772 [148 P. 530] [contract right not personal where there was no special reliance upon the personal skill and responsibility of the contractor, and the plaintiff was satisfied to have the work done by another].)

In this case, no one suggests that only the Gebauers were capable of making and selling the patented inventions. Tidwell never claims he was relying on the personal manufacturing craftsmanship or motorcycle marketing experience of the Gebauers. To the contrary, it is apparent the Gebauers required extensive training and assistance from Tidwell when starting their business. They seemed to have little knowledge about the production of motorcycle parts and needed help making connections in the motorcycle community to sell the products.

Moreover, Tidwell was not relying on the receipt of royalties. He had no stake in how many patented inventions were sold. After selling the patents, Tidwell's only remaining interest was to receive the balance of the purchase price. (See *Dopplmaier, supra,* 48 Cal.2d at pp. 223–224 [license rights to sprinklers not personal because inventor was not assured any definite royalty, licensee was not bound to produce a certain quantity, and inventor could terminate agreement if royalties returns unsatisfactory].) In light of all of the above, we conclude the contractually obtained right to mass-produce and sell aluminum motorcycle parts is not of a personal nature.

Tidwell theorizes that although the trial court ruled the contractual rights were not personal, it "implicitly recognized the personal nature of the patent license" by limiting assignment to one buyer (Edwards) and forbidding that buyer from reassigning the rights. Tidwell believes the Gebauers somehow persuaded the trial court to "try to do the right thing" and fashion an equitable remedy for both parties. Tidwell asserts the case sounded in law, not equity, and therefore if the rights were truly assignable it would be to anyone and not just one person. Tidwell misconstrues the court's ruling.

The court clearly, unequivocally, and repeatedly, stated the contractual rights were not personal. Tidwell fails to appreciate that this issue is distinct and separate from the question of how and when a corporation can sell assets subject to a lien. The assets at issue here are held by a corporation (SuperBrace), not personally by the individual shareholders (the Gebauers).

■ The acquisition of a corporate business can be structured in many ways, such as: (1) a stock purchase where the acquiring corporation became the parent corporation and selling corporation becomes the subsidiary; (2) an asset purchase or sale-of-assets reorganization (if assets are exchanged for stock in acquiring corporation); or (3) a merger whereby one corporation is absorbed by another. (See generally Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2004) ¶¶ 8:118–8:118.6, pp. 8-20.2 to 8-20.4.) Depending on the manner of acquisition, the buying corporation may be required to assume the seller's liabilities. (*Ibid.*)

Here, it is apparent the court was concerned about keeping Tidwell's loan adequately secured in the event of a sale. It fashioned a remedy to give Tidwell several levels of protection. By requiring the buyer to assume the liability, and to also keep the seller on the hook, the court determined the sale "does not diminish but instead enhances the security interest." In furtherance of this goal, the court limited Edward's acquisition methods to either (1) a sale of SuperBrace's assets (including the license); or (2) a sale "of all of the issued and outstanding shares of capital stock of SuperBrace." It evaluated the motivation and ability of the purchaser, making the factual determination the assets subject to the lien would be in safe hands. Indeed, the court predicted the sale would actually boost Tidwell's security interest because the facts show Edwards has "the youth, energy and experience to make SuperBrace Inc. a success, and to keep the monthly payments to [Tidwell] current."

We conclude, applying ordinary contract law principles, the license to practice the patent in this case was assignable (but also subject to the lien). We are compelled to follow valid Supreme Court precedent, until we hear differently from our state or federal Supreme Courts, or Congress.

III–VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed. Respondents shall recover their costs on appeal.

Moore, J., and Fybel, J., concurred.

.

---

*See footnote, *ante*, page 388.